480 A.2d 1153

Ibrahim KAZANJIAN,

v.

NEW ENGLAND PETROLEUM CORPORATION

v.

AMERICAN MINING AND EXPLORATION CORP., John Frazier and Kenneth W. Gemmil.

Appeal of Jack KAZANJIAN, John Kazanjian, O. Warren Higgens, Executors of The Estate of Ibrahim Kazanjian, Deceased.

Superior Court of Pennsylvania.

Argued Jan. 12, 1984.

Filed July 20, 1984.

Petition for Allowance of Appeal Denied Feb. 6, 1985.

1

2

Robert J. Kupits, Doylestown, for appellants.

Aaron C.F. Finkbiner, III, Philadelphia, for appellees.

Before CAVANAUGH, McEWEN and CIRILLO, JJ.

CAVANAUGH, Judge:

This case comes to us on appeal from the Final Decree of April 28, 1982, dismissing appellant's Exceptions to the Order of June 16, 1981 [1] and denying appellant's Petition for Specific Performance.

Appellants, executors of the estate of the decedent, Ibrahim Kazanjian, (one of the parties to the alleged settlement agreement at issue herein), sued in equity to compel specific performance of an alleged oral settlement agreement entered into by the expressly authorized counsel of Kazanjian and appellees. In their exceptions to the Order of June 16, 1981, appellants contest the factual determination that the parties did not intend to be bound by any settlement agreement until it was reduced to writing, and the consequent legal conclusion that there was no legally binding agreement created by the oral agreement of the parties' counsel. The lower court found that appellants' exceptions had no merit, and thus entered the Final Decree of April 28, 1982, dismissing said exceptions and denying appellant's Petition for Specific Performance. We reverse.

The chancellor found that the parties to the oral settlement agreement did not intend to be legally bound until the agreement was reduced to writing and executed by both parties. He therefore concluded that the oral settlement

---

1. In his Opinion of April 28, 1982, dismissing appellant's Exceptions to the Order of June 16, 1981, the chancellor correctly notes that the Order of June 16, 1981 should have properly been called a decree.

"Since the relief sought by plaintiffs was equitable in nature, it would have been the better practice for the Court to have denominated its Order as a "Decree" and its Opinion as an "Adjudication". However, all the necessary elements for an Adjudication, as set forth by Rule 1517 Pa.R.C.P., were contained in the Opinion and the plaintiffs chose to treat it as such by filing timely exceptions thereto under Rule 1518, Pa.R.C.P." Lower Court Opinion in support of Final Decree of April 28, 1982, at 1.

4

agreement was unenforceable. The sole issue raised on appeal is whether the chancellor's findings of fact were supported by competent evidence or whether his conclusion was unreasonable, an abuse of discretion or contrary to the law.

The appellate courts of Pennsylvania have consistently held that the scope of review of equity matters is limited and the chancellor's findings of fact will not be disturbed unless they are unsupported by adequate evidence. The chancellor's conclusion, being his reasoning from the facts, is reviewable, but only to determine whether or not the conclusion is reasonable, not contrary to law and not an abuse of discretion. *Krosnar v. Schmidt Krosnar McNaughton Garrett Co.*, 282 Pa.Super. 526, 423 A.2d 370 (1980). *See, e.g., Sack v. Feinman*, 489 Pa. 152, 413 A.2d 1059 (1980); *Curtis v. Redevelopment Authority of City of Philadelphia*, 482 Pa. 58, 393 A.2d 377 (1978); *Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273 (1976); *In re Thomas' Estate*, 463 Pa. 284, 344 A.2d 834 (1975).

This appeal evolves from a long and detailed history, most of which is not relevant for appellate review of the instant issue. The pertinent and undisputed chronology of events in the record may be summarized as follows.

Ibrahim Kazanjian originally brought an equity action against the defendants-appellees in 1968, alleging that they had wrongfully deprived him of his interests and proceeds in a Libyan oil concession. After a protracted series of legal proceedings, and an aborted settlement attempt in 1977, Kazanjian's counsel, Burton Spear, withdrew from the case in September 1977, but reentered it about a month later when Kazanjian contacted Spear and communicated a desire to settle the case. Spear then agreed to reenter the case on the express stipulation that he would be authorized to negotiate and settle the matter.

In October, 1977, Kazanjian wrote Judge McDevitt, who had presided over all the proceedings in this matter since October, 1968, advising him that he authorized Spear to

achieve a settlement on his behalf. In November, 1977, Spear wrote Kazanjian setting forth specific terms of settlement that he proposed to negotiate with appellees' counsel, Matthew Broderick. Spear then contacted Broderick, told him of Kazanjian's desire to settle and proposed the aforementioned terms of settlement. Broderick refused this proposal and Spear then prepared a revised proposal in accordance with Broderick's willingness to renegotiate a settlement. Spear and Broderick orally agreed to these terms [2] with the exception of the amount of cash that would be paid by appellees to Kazanjian. Spear communicated the proposed terms to Kazanjian and relayed that appellees were willing to pay him $75,000 cash as part of the settlement agreement. Kazanjian then asked Spear to try to get $80,000 instead of $75,000. This counter offer of the cash term was communicated to Broderick, and in January, 1978, Broderick phoned Spear and told him that the $80,000 figure was agreeable to his clients as well as all additional terms remaining as discussed on November 12, 1977. Therefore, the oral agreement of settlement contained the $80,000 cash payment term, and all of the terms that were agreed upon on November 12, 1977. On January 31, 1978, Spear advised Broderick to prepare the necessary paperwork in accordance with their agreement and forward it to him.

**2.** The express oral settlement agreement reached by counsel for the respective parties and as confirmed in the written "stipulation", prepared by counsel for appellees and delivered to Spear, counsel for Kazanjian agreed as follows: (note: the terms defendant and plaintiff refer to appellees herein and Kazanjian, who was the plaintiff in other litigation involving appellees.

(1) The corporate defendant shall pay the individual plaintiff $80,000.00;

(2) The corporate defendant shall assign whatever right title or interest it may have in the specified Concession Deed # 118 to the *plaintiff;*

(3) the plaintiff shall withdraw a specified appeal to the Supreme Court and a specified motion for rehearing and reconsideration;

(4) The parties shall execute full and mutual releases in the specified form; and

(5) The parties shall request this Court to approve final settlement and termination of the instant action upon the terms set forth in the preceding four sub-paragraphs.

On January 31, 1978, Broderick notified Judge McDevitt, that, *inter alia,* Broderick and Spear had agreed on the cash term of the settlement. On March 2, 1978, the settlement documents were sent by Broderick to Spear, who forwarded them to Kazanjian. However, one document was missing, of which omission Spear notified Broderick. A revised set of documents, conforming entirely to the oral agreement of January 31, 1978, was sent to Spear by Finkbiner, another attorney in Broderick's firm, on July 17, 1982. This occurred after several reminders to Broderick, by Judge McDevitt as well as Spear, who wanted to finalize the matter by executing the writings. These documents were signed by the appellees, and photocopies of cashiers' checks totalling $80,000 and drawn to Kazanjian were also enclosed. Spear checked these documents, found them to be conforming to the January 31, 1978, agreement, and tried to contact Kazanjian who was traveling extensively in Europe and the southwest United States. Spear, who had possession of the documents, finally managed to contact Kazanjian, at his mother's home, a few hours before his London bound flight was to depart. Kazanjian told Spear that he did not have time to sign the documents and make the flight, but he was planning to return to the United States in a few weeks and would sign at that time. In a futile effort to confer power of attorney to Spear so that he could execute the documents, Kazanjian signed a blank piece of paper, which he gave to his brother to give to Spear, so that Spear could fill it in as conferring to him Kazanjian's power of attorney. Kazanjian then went to England, where he died on or about August 17, 1978, just a month after the complete set of documents, executed by appellees, was sent to Spear. Appellees, upon learning of Kazanjian's death, sent Spear a letter dated August 29, 1978, disclaiming that there was a settlement agreement made with Kazanjian prior to his death. The executors of Kazanjian's estate, appellants herein, thereafter signed the documents, and brought this action in specific performance to have them enforced. This is the appeal from the Final Decree denying specific performance.

The focus of our review must be on the chancellor's factual determination that there was no intent on the part of Kazanjian to be bound by the oral agreement. This is so because if the factual finding is not supported by the record, the consequent legal conclusion that there was no binding agreement until the writing was executed, fails. On the other hand, if the chancellor's factual finding is upheld on appellate review, and the alleged settlement agreement is viewed as an offer, the executor's signing of the documents would be of no consequence, as the executor could not legally accept an offer made to Kazanjian.

We first address appellees' contention that the "facts pertinent to this stage of the proceedings are those which surround the parties' attempts to negotiate a settlement of this case and the failure to reach a binding settlement because of Kazanjian's untimely death."

 Of course, preliminary negotiations do not constitute a contract. "However, if the parties orally agree to all of the terms of a contract between them and mutually expect the imminent drafting of a written contract reflecting their previous understanding, the oral contract may be enforceable." *Skrocki v. Caltabiano*, 505 F.Supp. 916 (1981) (applying Pennsylvania Law); *Ketchum v. Conneaut Lake Co.*, 309 Pa. 224, 163 A. 534 (1933).

 An oral settlement agreement may be enforceable and legally binding without a writing. "Where parties have reached an oral agreement, the fact that they intend to reduce the agreement to writing does not prevent enforcement of the oral agreement. *Ketchum et al. v. Conneaut Lake Co., supra*"; *Springer v. Springer*, 255 Pa.Super. 35, 38, 386 A.2d 122, 124 (1978); *Schermer v. Wilmart*, 282 Pa. 55, 127 A. 315 (1925); *Taylor v. Stanley Co. of America*, 305 Pa. 546, 158 A. 157 (1932).

 Section 27 of the Restatement Second of Contracts [3] provides:

3. This excerpt from the Restatement Second is almost verbatim with the Restatement of Contracts, § 276, and comment a which the court

## § 27. Existence of Contract Where Written Memorial is Contemplated

**Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.**

**Comment:**

*a.* Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

"Moreover, it is well-settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter is not inconsistent with the present contract." *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856, 859–60 (3rd.Cir.1965); *Field v. Golden Triangle Broadcasting Corp.,* 451 Pa. 410, 305 A.2d 689 (1973).

In *Woodbridge v. Hall,* 366 Pa. 46, 76 A.2d 205 (1950), our Supreme Court found a binding and enforceable oral settlement agreement because each term in the agreement had been orally agreed upon, although the parties were unable,

in Milow v. Miller, 11 Lebanon 105 (1966), relied upon. The court held that an oral settlement agreement, which incorporated a general release, bills of sale, and other writings, was legally binding and enforceable even though the documents had not been delivered or executed. *Milow v. Miller, supra,* is factually apposite to the case at bar.

even after three drafts, to reduce the settlement to writing as had been intended.

Similarly, the Federal Courts have long recognized that under Pennsylvania law an oral agreement to settle litigation is in itself a binding and enforceable agreement even where performance is postponed to a later date:

> The settlement agreement which was entered into by duly authorized counsel expressed the intention to settle the case for the agreed amount and was valid and binding despite the absence of any writing or formality. *See Main Line Theatres, Inc. vs. Paramount Film Distributing Corp.*, 298 F.2d 801 (3 Cir.) cert. denied. 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962). The tender of a release did not reopen the agreement or make its execution a condition to the settlement itself. *See Main Line Theatres, Inc. v. Paramount Film Distributing Corp., supra.*

*Good v. Pennsylvania Railroad Co.*, 384 F.2d 989, 990 (3rd Cir.1967).

In this connection, *see also, Gross v. Penn Mutual Life Insurance Company*, 396 F.Supp. 373, 374–75 (1975), where the Court held that one of the principal parties was bound by the terms of a settlement orally agreed to by the attorneys of the parties even though the protesting party had expressly tried to disavow the settlement within a few days after such oral agreement had been made:

> It is obvious that the ... (party) had a change of heart between the time he agreed to the terms of the settlement and when they were reduced to writing ... Here, ... (the party) acted too late. The bargain had already been struck on his terms.

*Gross, supra,* 373 F.Supp. at 375 (Citations omitted; parenthetical expressions added). This case is also factually apposite to the case at bar because it appears that appellees herein had a change of heart after learning of Kazanjian's death.

■ We acknowledge that the oral settlement agreement is enforceable only if the parties, through their respective counsel, assented to the terms and if a writing was not a condition of the contract. However, we reject appellees' contention that the communications between counsel were merely in the negotiations stage at the time of Kazanjian's death and therefore there was no contract.

We now turn to the chancellor's determination that there was no intent to be bound, on the part of Kazanjian, until the writing was executed. In the Final Decree of August 28, Judge McDevitt refers to the facts and conclusions of law set forth in his Order of June 16, 1981, denying appellant's Petition for Specific Performance of a Settlement Agreement.[4]

The chancellor therein cites the letter from Mr. Broderick, dated January 31, 1978, which stated:

Dear Judge McDevitt:

I have your letter of January 24, 1978. This matter now appears to be settled in that Mr. Spear and I have agreed on a lump sum settlement figure. We are in the process of preparing the necessary papers. After they have been signed by the parties, they will be submitted to Your Honor for approval.

The chancellor also notes the following excerpt as supportive that Kazanjian did not intend to be bound *until* the settlement agreement was reduced to writing.

BY Mr. Broderick:

Q. Mr. Finkbiner, you are a partner at Dechert, Price & Rhoads, are you not?

**4.** We note a misstatement of fact, which the chancellor uses to support his finding of no intention to be bound by Kazanjian. The comment was made in regard to the earlier settlement attempt of 1977. The opinion states: "During the many years of this litigation, several attempts were made to settle the matter, but always to no avail because of the high demand figure propounded by the plaintiff." The monetary figure was certainly an issue earlier, but also, Spear testified, and this was undisputed that the aborted proposed settlement agreement of 1977 also contained a term that the cash term payable over a five year term would cease upon Kazanjian's death and his estate would have no right to it. This was unagreeable to Kazanjian.

A. That's correct.

Q. Did you have any discussions, Mr. Finkbiner, in the first six months of 1978 with Mr. Spear concerning a possible settlement of the action Mr. Kazanjian had brought against American Mining and others?

A. Yes, I did.

Q. Did any portion or part of those discussions relate to the execution of certain documents by the defendants?

A. Yes.

Q. And can you tell us what Mr. Spear said to you in that regard and what you said to him?

A. Mr. Spear insisted that all of the settlement documents I had sent to him be first signed by all of the defendants and that, also, a settlement check in the amount of $80,000 be submitted before he would present the settlement papers to Mr. Kazanjian for Mr. Kazanjian's signature.

Q. Did he tell you why he made that request?

A. He said that he would not under any circumstances present it any other way; that that was his requirement and that that was the only way he thought he could get the settlement, get Kazanjian to sign the papers.

The chancellor stated that "[a] crucial consideration in reaching that conclusion [the conclusion that the parties did not intend to be bound by any settlement agreement until it was reduced to writing] was the aforecited conduct of decedent's attorney, Burton Spear."

The chancellor further opined that "Mr. Spear's numerous efforts to contact Kazanjian for submission of the papers also indicated an awareness that his client would not consider himself bound to the agreement until his signature was affixed thereto." The chancellor's resulting conclusion that the effort to formalize the agreement negates the existence of a binding oral contract, is belied by other parts of the record and is not supportive evidence of the parties' concern as to the performance of an agreement already

reached.[5] On the contrary, we find that the relied upon portion of the record reveals a prudent course of conduct on the part of both counsel which evidences an intention to have the documents executed on the part of both Spear and Kazanjian.

We feel that the following evidence clearly establishes that the oral agreement was intended to be a binding contract. Kazanjian not only authorized Spear to negotiate the terms of the settlement agreement, but agreed to them, and Broderick was advised of this. Broderick was likewise authorized by his clients to reach a settlement agreement on their behalf containing these same terms, to which terms appellees agreed. Thus there was mutual assent of the parties through their attorneys.

■ Moreover, the record reveals that Spear and Broderick negotiated an oral agreement on each and every term that was later formalized by the writing, by January, 1978. These terms were negotiated and agreed upon. Broderick wrote Judge McDevitt on January 31, 1978 advising him

5. Kazanjian requested Spear to reenter the case solely for the purpose of achieving a settlement, as he had had a change of heart about the desirability of additional protracted litigation and wanted to be free of the already heavy burden the litigation had become. It is undisputed, and the chancellor makes a note of the fact that Kazanjian was deeply emotionally involved in the case, which had its origin in 1966. However, there is no evidence from the point in time that he asked Spear to reenter the case, October, 1977, until his death, August, 1978, that he interfered or even tried to directly participate in Spear's activities in achieving a settlement; the evidence is to the contrary; he fully turned over the duties of negotiation and settlement to Spear, and acquiesced in his suggestions.

In addition, the chancellor relied upon the fact that Kazanjian would not miss an international flight, to sign the documents when given no notice and when he was planning to return to the United States in three weeks, to show lack of intention to be bound. The documents had taken Broderick over six months to satisfactorily reduce to writing, with prodding by both the chancellor and Spear, because of other intervening personal and business matters. Kazanjian had no idea that these documents had been prepared and reduced to writing, ready for him to execute, until he spoke to Spear on the phone shortly before he was to depart for London. We do not see that this evidence supports any finding that this conduct evidences any procrastination, bad faith, or lack of intention to be bound. Kazanjian even attempted to confer a power of attorney on Spear to sign for him.

that the lump sum [the final term] had been agreed upon and "this matter now appears to be settled." Appellees executed the documents memorializing the settlement agreement and sent these documents, with photocopies of cashiers' checks drawn to Kazanjian in the amount of $80,000 to Spear to obtain the execution of said documents. We find that the chancellor's conclusion that "there is a substantial evidentiary basis for our determination that the parties did not intend to be bound until the written instrument was signed by all concerned ... [and that the] [p]laintiffs failed to present credible evidence to the contrary ..." is erroneous and is not supported by the record. We therefore reverse.

Decree reversed. Specific performance ordered.