516 A.2d 765

**CENTURY INN, INC., a Pennsylvania corporation, Appellant,**

**v.**

**CENTURY INN REALTY, INC., a Pennsylvania corporation; Joan Bigelow, Nancy Scheirer and Robert Scheirer, Appellees.**

Superior Court of Pennsylvania.

Argued May 22, 1986.

Filed Oct. 20, 1986.

J. Shane Creamer, Philadelphia, for appellant.

Ira S. Lefton, Pittsburgh, for appellees.

Before BROSKY, KELLY and ROBERTS, JJ.

KELLY, Judge:

This appeal arises from a dispute between the appellant, Century Inn, Inc. ("Century Inn"), and appellees, Century Inn Realty, Inc., Joan Bigelow, Nancy Scheirer, and Robert Scheirer ("Century Realty"). On February 7, 1978, Century Inn brought an action in equity seeking, *inter alia*, to enjoin Century Realty from interfering with the operation of the restaurant known as Century Inn. The case was called for trial on July 10, 1979.[1] On that date, the parties were able to negotiate a settlement agreement. The terms of the somewhat complex agreement, which involved the conveyance of property interests and the issuance of a mortgage, were placed upon the record in open court. In the months and years that followed, the parties attempted unsuccessfully, with the assistance of the court, to draft the terms of the documents necessary for carrying out the agreement which had been reached. Finally, when almost seven years had elapsed from the date of the stipulation,

---

1. Actually, the case was heard in April, 1979; however, the trial judge passed away before an adjudication issued, and the case was subsequently relisted.

the court directed the parties to prepare a set of documents which would be acceptable to each of them. This was done, and after reviewing the documents, the court below prepared its own documents, "attempting to retain as much as possible the language of the respective parties...." The court then made two sets of changes to the documents, based upon the comments and exceptions of the parties, and prepared a final draft of the documents. On August 20, 1985, the court ordered the parties to appear on September 27, 1985 for the purpose of executing the documents. Century Inn appealed this order.[2] Because we conclude that the court below erred in ordering Century Inn to execute documents which varied from the terms of the earlier settlement agreement, we vacate the order of the court below and remand for further proceedings.

In order to fully understand the issue which is raised in this appeal, it is necessary to review the tangled facts underlying the parties' dispute. As determined by the court below, the three real parties in interest in this sordid family disagreement are Gordon Harrington, Joan Bigelow and Nancy Scheirer. Gordon, Bigelow and Scheirer are the three children of Mary Harrington. Century Inn was incorporated by Mary Harrington[3] in 1970. Mary Harrington owned certain real property, which she began leasing to Century Inn in April, 1970. Century Inn operated a restaurant on the premises. In 1976, Mary Harrington formed a second corporation, Century Realty. Mary Harrington was the sole shareholder, sole director, and secretary-treasurer of Realty; she elected her son, Gordon Harrington, as president.

Mrs. Harrington transferred the real estate which she owned and which had been leased to Century Inn to Realty. Realty ratified the lease, so that the property continued to

---

2. Century Realty filed a motion to quash the appeal, alleging that the August 20, 1985 order was not a final and appealable decree. The motion to quash was subsequently withdrawn.

3. Century Inn, Inc. was incorporated by Mary Harrington and her husband; however, for purposes of simplifying the facts, we refer only to Mary Harrington.

be leased to Century Inn for its restaurant business. In December 1976, Mrs. Harrington transferred 39,000 shares of the 100,000 shares of Realty to her children in equal parts of 13,000 each; she retained 61,000 shares.

Mrs. Harrington died in June, 1977. At the time of her death, she also held the majority of the shares of Century Inn stock; each of the three children held 2,000 of the shares, with Mary Harrington holding 9,000 shares. The situation which arose with the death of Mrs. Harrington ultimately led to the litigation now before us. The three children, Gordon Harrington, Bigelow, and Scheirer, were the co-executors of Mrs. Harrington's estate. According to the terms of Mrs. Harrington's will, Gordon Harrington received a life estate in Mrs. Harrington's 9,000 shares of Century Inn stock. A dispute arose as to whether Scheirer and Bigelow, as majority trustees, or Gordon Harrington as tenant of the life estate, could vote the shares of Century Inn stock which were formerly held by Mrs. Harrington.

In December, 1977, the orphan's court division of the Washington County Court of Common Pleas awarded Gordon Harrington an advance distribution of the 9,000 shares. This effectively resulted in a redistribution of the previously equally distributed voting powers within Century Inn. Gordon Harrington now could vote a total of 11,000 shares, while his two siblings together held voting power over 4,000 shares.[4]

Scheirer and Bigelow called a special meeting of the other corporation, Century Realty, in January, 1978. As stated previously, the three held equal shares in Realty. At the meeting, Bigelow and Scheirer moved that Century Inn be removed from the leased premises, and that Realty take over the restaurant facility. Harrington voted against this move.

In February 1978, Harrington, claiming that he had been physically barred from the premises of the leasehold, brought a suit in equity on behalf of Century Inn. Century

4. The three elected themselves directors of Century Inn at a shareholders meeting in September, 1977.

Inn sought to enjoin Realty from interfering with the operation of the business.

As previously stated, the parties after extensive negotiation reached a settlement on July 10, 1979. The terms of the agreement were placed upon the record by the judge in open court. The stipulation provided for the sale of the interest of Bigelow and Scheirer in both corporations to their brother, Harrington. The practical effect of this transaction would be to pass control to Harrington of both the real estate upon which the restaurant is located and the management of the restaurant itself. Harrington was to pay the sum of $300,000 to Bigelow and Scheirer for their interest; $260,000 of the $300,000 was to be secured by a first mortgage of the property owned by Realty, "to be amortized over twenty years as a level payment direct reduction mortgage at an interest rate of seven percent." (Transcript of Stipulation, p. 2). The payment of the $260,000 by Harrington was to be secured by the execution of a judgment note. The remaining sum of $40,000 was to be paid to Bigelow and Scheirer in accordance with the stipulation.

Under the terms of the stipulation, Bigelow and Scheirer were to surrender possession of the restaurant property by midnight of July 15, 1979. After extensive negotiations, the parties indicated to the court that they could not reach an amicable agreement regarding the language of the documents necessary for carrying out the agreement. The court on September 11, 1979 directed that Gordon Harrington assume immediate possession and control of the operation of the restaurant. On November 13, 1980, the court directed Harrington to deposit the current sum of all the payments agreed upon to the prothonotary of Washington County, and to each month thereafter deposit the contemplated mortgage payment. In accordance with these orders, Harrington to date continues to occupy the premises and operate the restaurant; the agreed upon mortgage payments have been timely paid, and are held in an escrow account for the benefit of Bigelow and Scheirer.

The court diligently continued its efforts to work with the parties in reaching an agreement regarding the language to be contained within the mortgage and the promissory note. Finally, the court draft its own proposed documents and ordered that the parties appear for the purpose of executing those documents.

The enforceability of settlement agreements is determined according to principles of contract law. If all of the material terms of the bargain are agreed upon, our courts will enforce the settlement. *See Kazanjian v. New England Petroleum Corporation*, 332 Pa.Super. 1, 480 A.2d 1153 (1984); *Zager v. Gubernick*, 205 Pa.Super. 168, 208 A.2d 45 (1965). As this Court stated in *Kazanjian, supra:*

> Of course, preliminary negotiations do not constitute a contract. However, if the parties orally agree to all the terms of a contract between them and mutually expect the imminent drafting of a written contract reflecting their previous understanding, the oral contract may be enforceable. *Skrocki v. Caltabiano*, 505 F.Supp. 916 (1981) (applying Pennsylvania law); *Ketchum v. Conneaut Lake Company*, 309 Pa. 224, 163 A. 534 (1933).

332 Pa.Superior Ct. at 7, 480 A.2d at 1157. In *Kazanjian*, the court held that, since the record revealed that the parties had orally agreed to "each and every term that was later formalized by the writing," the oral agreement was binding and could be enforced. 332 Pa.Superior Ct. at 12, 480 A.2d at 1159.

In the case at bar, the settlement which was placed upon the record in open court contains every term necessary to consummate the transfer. Joan Bigelow and Nancy Scheirer agreed to "sell all their right, title and interest in the property"; they waived all rights to distribution of any shares of the property and surrendered their interest as remaindermen. The financial terms were stated with particularity: the purchase price for the property was set at $300,000; $260,000 of this amount was to be "secured by first mortgage to be amortized over twenty years as a level payment direct reduction mortgage at an interest rate of seven percent," with the balance of $40,000 to be paid from

the assets of Century Realty. The detailed settlement contains all material terms necessary for carrying out the bargain. The settlement is therefore enforceable by either party.

Neither the appellant nor the appellees challenge the terms of the agreement reached between the parties. Instead, appellant claims on appeal that the lower court abused its discretion in ordering the parties to sign the documents which were drawn up by the court. We agree.

In resolving the issue presented in the instant case, we are guided by the recent Superior Court decision in *Johnston v. Johnston*, 346 Pa.Super. 427, 499 A.2d 1074 (1985). The factual scenario presented in *Johnston* bears close similarity to that which exists in the case at bar. The parties in *Johnston* reached a settlement during trial which was recited in open court. After counsel for plaintiffs reduced the agreement to writing, defendants refused to sign it. The trial court, after a hearing on plaintiffs' petition for contempt, ordered that defendants execute the agreement within fifteen days or suffer a penalty of contempt. Defendants appealed.

On appeal, this Court first rejected defendants' contention that the parties did not intend to be bound by the agreement, and that it was therefore unenforceable. The Court then stated:

> Appellants are correct, however, when they assert that the written agreement presented to them for their signatures contained provisions that were at variance with the agreement reached in open court. Indeed, appellees do not appear to contest that differences exist. They argue, however, that the essence of the agreement was that appellants would hold the farm in trust and that this was not varied by the drafted agreement. The only differences, they suggest, are immaterial. These differences, they argue, are trivial and unreasonable. We disagree. *The trial court could enforce under penalty of contempt only the agreement reached in open court; it*

*could not properly require appellants to sign a different agreement.*

346 Pa.Superior Ct. at 433, 499 A.2d at 1077–78 (emphasis added) (footnotes omitted). The Court continued:

> We express no opinion regarding the alleged contumaciousness of appellants' conduct or the remedy available to appellees if appellants continue their refusal to conclude the settlement to which they agreed in open court. *We hold only that the trial court cannot compel appellants, as a part of their settlement, to sign a written contract which is not in all respects consistent with the agreement reached during trial and placed upon the record* by the parties and their attorneys.

346 Pa.Superior Ct. at 433, 499 A.2d at 1078 (emphasis added).

Appellee, Century Realty, concedes that the documents prepared by the court contain additional clauses which were not contained in the settlement. Realty argues, however, that the additional terms "do not vary from or contradict the material terms of the stipulation and are merely customary and necessary terms normally included in mortgages, security agreements, judgment notes and the other documents required to implement the closing of the transfer set forth in the stipulation." (Appellees' Brief at 10). Century Realty further attempts to distinguish *Johnston* on the basis that the stipulation at issue herein included a proviso that the court below would retain jurisdiction "and oversee the execution of the necessary documents to effectuate the intent of this stipulation." (Transcript of Stipulation, p. 4). Thus, Century Realty argues, the parties stipulated that the lower court would draft the necessary documents.

We reject appellees' argument that the court's authority to oversee the execution of the necessary documents included the right to draft the documents which are at issue. We further find that, as in *Johnston, supra,* the language in the final documents differs substantially from the agreement which was reached by the parties. The documents prepared by the court contain numerous provisions which were not contained in the stipulation, including penalties for

late payment, assignment of the risk of loss, payment of counsel fees, and intricacies regarding the maintenance and restoration of the real property.[5] More importantly, several of the clauses contained within the documents are ambiguous or unreasonable. For instance, Section 6 of the mortgage provides in part that if:

> (b) [Century Realty] shall default in the performance or observance of *any covenant, agreement, condition, provision,* and such default shall not be remedied within a period of thirty (30) days after notice thereof ...
>
> Then "[Bigelow or Scheirer's agent, or the holder of the promissory note] shall have the right ... in its sole discretion and without notice to [Century Realty] ... *to declare the Debt to be ... immediately due* and payable *without presentment, demand, protest, or notice* of any kind ... [Century Realty] hereby forever waives and releases all errors in such foreclosure proceeding or action."

(Final Mortgage, p. 10–11) (emphasis added).

This provision, entitling seller to declare the debt to be immediately due, without notice upon default of any type, regardless of whether the default is material in nature, certainly differs substantially from the documents envisioned by the stipulation.

We recognize the justifiable frustration of a trial court which attempts to oversee the execution of settlement documents, where the parties appear unable to agree upon the wording of those documents, despite literally years of negotiation. The court in such a situation may, of course, upon petition of one party, utilize the powers of contempt against a party who unreasonably attempts to thwart the fulfillment of the settlement agreement,[6] if the agreement has

---

**5.** In particular, the clauses granting seller veto power over restoration of the premises and the escrow provisions are not common to commercial mortgages.

**6.** In the instant case, implicit in the settlement agreement is the fact that both parties anticipated the future execution of a mortgage; if one of the parties had then refused to sign a standard form mortgage of the type typically used in Washington County, the opposing party

been incorporated into a court order. The court may not, however, order the parties to execute the court's own agreement, or face a contempt citation, where that agreement differs from the terms of the settlement.

The court below erred in ordering the parties to execute documents which differed from the terms of their stipulation. Accordingly, the order is vacated and the case is remanded. Jurisdiction is relinquished.

could have petitioned for contempt, claiming the refusal to be an unreasonable attempt to circumvent the settlement agreement.