J-A29010-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: JOHN E. JACKSON AND SUE M. JACKSON, CHARITABLE TRUST | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: POLLY J. TOWNSEND AND WILLIAM R. JACKSON, JR. | : : : : : : | No. 70 WDA 2019 |

Appeal from the Order Entered December 11, 2018
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): 3999 of 1988

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED APRIL 17, 2020**

Polly J. Townsend and William R. Jackson, Jr. ("Individual Trustees"), appeal from the December 11, 2018 order, approving a mediation settlement agreement they entered into with co-trustee, PNC Bank, N.A. ("PNC"), to resolve a dispute regarding the John E. Jackson and Sue M. Jackson Charitable Trust ("Trust"). After careful review, we affirm.

John E. Jackson and Sue M. Jackson ("Grantors") established the Trust on February 6, 1950.[1] It was created "solely for charitable purposes, and the income and principal of the [T]rust estate is to be used for the sole benefit of public charities…." Trust at ¶ 4. The Trust originally named two trustees— W.R. Jackson (John E. Jackson's younger brother) and Commonwealth Trust

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] John E. Jackson lived until April of 1971, and Sue M. Jackson lived until January of 1994.

Company of Pittsburgh. In 1989, W.R. Jackson resigned and his daughter, Polly J. Townsend, was appointed to replace him as a co-trustee. The Trust was reformed in 1998 to provide that there shall always be two trustees— National City Bank of Pennsylvania and its successors,[2] and an individual trustee who is a member of the Jackson family. In May of 2005, the orphans' court entered an order reforming the Trust's appointment provision again, and stated, in part:

> There shall always be three trustees acting hereunder, National City Bank of Pennsylvania and its successors, which shall possess at all times one-half of the voting power of the trustees, and two individual trustees who are members of the Jackson family, each of whom shall possess at all times one-fourth of the voting power of the trustees.

Order, 5/24/05. The court also approved the appointment of William R. Jackson, Jr. (Polly's brother) as the second individual co-trustee. PNC became the successor corporate co-trustee in 2009, after it acquired National City Bank.

Section 6 of the Trust provides the following regarding distributions:

> The [t]rustees shall distribute the income of the [T]rust fund among such public charities created for religious, educational or other charitable purposes as they in their sole discretion may deem proper. The Grantors may from time to time suggest to the [t]rustees specific charitable institutions or charitable causes to which they would like contributions made by the [t]rustees but the [t]rustees are in no manner obligated to follow the requests of the Grantors but, on the contrary, may distribute the income and principal of the [T]rust fund for such charitable purposes as they in their sole discretion may determine.

---

[2] National City Bank of Pennsylvania was a successor in interest to Commonwealth Trust Company of Pittsburgh.

Trust ¶ 6.

In 2016, PNC filed a petition to resolve a deadlock, which had formed between PNC and Individual Trustees regarding the amounts and recipients of the donations for 2016. According to PNC, it sought judicial intervention because, in order to avoid a tax penalty under Section 4942 of the Internal Revenue Code, the Trust needed to distribute at least 5% of its net assets before the end of the year. PNC's Petition, 11/28/16, at 6 ¶ 20 (citing 26 U.S.C. § 4942). PNC further indicated that "in keeping with the traditional giving pattern of the … Trust during the lifetime of the [Grantors]," it has strongly favored distributing the Trust's funds "to civic organizations, educational/arts organizations, health care facilities and children & youth organizations, with at least one-half of such distributions being to charitable organizations primarily situated in Western Pennsylvania." *Id.* at 6 ¶ 21. PNC contrasted its list of "worthwhile charities" with the organizations favored by Individual Trustees, which PNC characterized as "political advocacy groups[,]" and which it believed to be inconsistent with the past giving practices of the Grantors. *Id.* at 8 ¶ 27. PNC provided the court with a list of 26 organizations that it selected to receive one-half of the required distribution for 2016, along with a list of 18 organizations it selected from the list submitted by Individual Trustees to receive the other one-half of the distribution. *See id.* at 8-9 ¶¶ 29-30. It asked the court to "resolve the current deadlock by casting a 'third vote[,'] either in favor of the list submitted by [PNC] … or the list submitted by … [I]ndividual [T]rustees…." *Id.* at 9 ¶ 32.

On December 1, 2016, Individual Trustees filed an answer and new matter, in which they alleged that PNC "unilaterally imposed an artificial 5% limit on the Trust's annual charitable giving, forced the Trust to donate to local causes supported by PNC, and refused to allow charitable contributions to legitimate charities recommended by [Individual Trustees] (and supported by the Trust for decades)." Answer and New Matter, 12/1/16, at 1. They also averred that the Grantors intended for Individual Trustees to make donation decisions, and that PNC's "proper role" is to work with them to facilitate donations to charities selected by Individual Trustees and to manage the Trust's assets. *Id.* at 3, 6.

After hearing oral argument on the petition on December 2, 2016, the orphans' court stated that it would cap donations at 5% of the Trust's assets to avoid a tax penalty and took the designation of charitable recipients under advisement. On December 7, 2016, the orphans' court entered an order selecting the charities on PNC's list for distributions in 2016. Individual Trustees filed a motion for reconsideration, which was denied by the court on December 19, 2016.

On January 5, 2017, Individual Trustees filed a timely appeal at 61 WDA 2017, in which they argued, *inter alia*, that the orphans' court erred in limiting the Trust's 2016 distributions to 5% of the Trust's assets and by selecting PNC's list of proposed donees without attempting to discern the Grantors' intent. In response, the orphans' court issued an opinion pursuant to Pa.R.A.P. 1925(a), in which it explained that its decision was based on the

time constraints placed upon the court and the lack of time needed to fully vet all options. Orphans' Court Opinion ("OCO I"), 5/2/17, at 2.

This Court concluded that the orphans' court acted prudently in limiting the amount of the 2016 distribution to avoid the imposition of a tax penalty on the Trust. *In re Jackson*, 174 A.3d 14, 33 (Pa. Super. 2017). Going forward, however, we deemed it necessary to develop a factual record for the purpose of exploring the Grantors' intent. *Id.* In regards to the orphans' court decision to select PNC's list of proposed donees, we concluded:

> [T]he court abused its discretion by making a decision that was not based on any evidence. We also conclude[d] that the court abused its discretion by accepting PNC's invitation to choose either its list or that proffered by Individual Trustees; the court was required to exercise judgment to determine appropriate recipients of the Trust's gifts, and it should not have allowed its selection to be constrained by the parties' submission of exclusive slates.
>
> The Grantors' intent with regard to beneficiaries cannot be ascertained based on the Trust Agreement alone…. [T]he [o]rphans' [c]ourt was required to consider extrinsic evidence of the Grantors' intent to determine whether additional criteria should be applied to the donee selection process. The court abused its discretion in failing to do so.

*Id.* at 34.

Accordingly, we affirmed that part of the orphans' court's order that required distribution of 5% of the Trust's assets in 2016 and vacated the part of the order that adopted PNC's list of donees. We remanded the matter for further proceedings to determine the Grantors' intent with regard to distribution of the Trust's funds and directed the orphans' court to permit expedited discovery. *Id.* at 37. Moreover, we stated:

> We also leave it to the [o]rphans' [c]ourt in the first instance to determine as a matter of equity what, if anything, should be done regarding the 2016 distributions that were made by the Trust pursuant to that court's December 7, 2016 order, which selected charitable recipients from PNC's preferred list. Recipients of those distributions are likely to have relied on those funds, and it may be unrealistic and inequitable to consider any repayment obligation if the [o]rphans' [c]ourt ultimately decides that gifts should have been awarded to different recipients. It also may no longer be practical to make additional 2016 contributions to additional charities from Individual Trustees' preferred list. The [o]rphans' [c]ourt should work with the parties to craft any additional remedy.

*Id.*

In order to avoid the possibility of another deadlock between PNC and Individual Trustees regarding the charitable distributions for 2017, the orphans' court ordered that "all outstanding issues among the parties relating to the on-going administration of the … Trust" be submitted to mediation with retired Judge Frank J. Lucchino. Order, 9/5/17. After a 10-hour mediation session on October 11, 2017, the parties reached a settlement agreement ("Mediation Agreement"), the terms of which were read on the record by Judge Lucchino and were fully memorialized by a court reporter. *See* N.T. Mediation, 10/11/17, at 2-32. The orphans' court summarized these terms as follows:

> The result of the mediation was for the five-year period of 2017-2021 inclusive. The rate of distribution for the five-year period is 6.5% per year. At the end of this five-year period, the parties will meet and[,] if in agreement[,] may maintain [the rate] at 6.5% per year. If no agreement is reached[,] 6%[] per year will be the floor.
>
> For the calendar year [of] 2018 and going forward, it was agreed that the CyberGrant platform that PNC is currently using to receive applications for grants would be used and access given to [] [I]ndividual Trustees regarding the Trust. The deadline for

- 6 -

receiving applications for 2018 and going forward will be June 15. That by June 30, and going forward, [] [I]ndividual Trustees, as well as PNC, as trustee, will select up to 25% of the grantees in terms of dollars. PNC will do an analysis of the grants that they receive, that are not part of the 25% that each trustee designates in the list that they exchanged, by June 30. PNC will provide the analysis of that 50% to [] [I]ndividual [T]rustees. [] [I]ndividual [T]rustees will have 30 days to analyze these analyses. That on or before August 31[] of each year, and if it happens to fall on a holiday, it will be carried over to the next business day following the holiday, [] [I]ndividual [T]rustees and PNC, as trustee[,] will meet for their first meeting. At this meeting, the co-trustees can decide what they agree on, up to the limit that is provided for total distribution. If the co-trustees cannot reach a decision at the first meeting, they will have until November 1[] of that year to meet again. If the co-trustees are deadlocked, the remaining parts of the 50% will have their grant increased to cover the required minimum distribution required by the IRS.

For 2017, it had been agreed that 6.5% times the market value of the [T]rust as issued by PNC as of December 31, 2016, will be the amount that will be distributed for 2017.

Orphans' Court Opinion ("OCO II"), 12/11/18, at 1-2 (unnecessary capitalization omitted).

At the end of the mediation, counsel for Individual Trustees discussed the possibility of his clients' withdrawal of the appeal at 61 WDA 2017. The withdrawal never occurred, however, and this Court issued its decision in that matter on November 7, 2017. *See **Jackson**, **supra*** ("***Jackson*** Opinion"). On February 2, 2018, Individual Trustees filed a motion to commence the proceedings dictated by the ***Jackson*** Opinion and to abrogate, amend or, in the alternative, suspend implementation of the Mediation Agreement ("Motion to Abrogate"). A hearing was held on February 12, 2018, and the court subsequently issued an order setting a discovery schedule.

On June 19, 2018, PNC filed a petition for a rule to show cause why the Mediation Agreement should not be enforced. Individual Trustees filed an answer and new matter on July 9, 2018. On December 11, 2018, the orphans' court entered an order stating that "the terms of the agreed upon [M]ediation [Agreement] between the [p]arties are binding for 2017 going forward as outlined in the accompanying [o]pinion." Order, 12/11/18. Individual Trustees filed a timely notice of appeal on January 10, 2019, and herein present the following issues for our review:

I.   Whether the [orphans'] court erred by enforcing and binding the trustees to a purported settlement agreement ("Mediation [Agreement]") in perpetuity without holding an evidentiary hearing to decide controverted issues regarding the existence, terms, and binding effect of any purported settlement?

II.  Whether the [orphans'] court erred by enforcing and binding the trustees to the Mediation [Agreement] in perpetuity even though the purported terms of the Mediation [Agreement] are contrary to the law, as set forth in the subsequently issued Superior Court's November 7, 2017 [o]pinion, and [] Grantors' intent?

III. Whether the [orphans'] court erred by enforcing and binding the trustees to the Mediation [Agreement] in perpetuity even though it is an unenforceable agreement to agree?

IV.  Whether the [orphans'] court erred by enforcing and binding the trustees to the Mediation [Agreement] in perpetuity even though the purported agreement lacks consideration, fails for indefiniteness, and is otherwise unenforceable under traditional principles of contract law?

Individual Trustees' Brief at 4.

Preliminarily, we address PNC's motion to dismiss claims I, III, and IV, for failure to preserve these issues at the trial court level. *See* Renewed

- 8 -

Motion to Dismiss, 10/28/19.[3]  PNC argues that Individual Trustees never disputed the existence of the Mediation Agreement before the lower court, failed to assert that the Mediation Agreement was a mere "agreement to agree[,]" and failed to aver that the Mediation Agreement "lacked consideration" or "fails for indefiniteness[.]"  ***Id.*** at 1 ¶ 3.  ***See also id.*** at 3 ¶ 10.  Rather than preserve these issues, PNC asserts that Individual Trustees conceded that a settlement agreement was reached at the conclusion of the mediation.  ***Id.*** at 2 ¶ 4.

Indeed:

> Issue preservation is foundational to proper appellate review.  Our rules of appellate procedure mandate that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."  Pa.R.A.P. 302(a).  By requiring that an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue.  This jurisprudential mandate is also grounded upon the principle that a trial court … must be given the opportunity to correct its errors as early as possible.

***In re F.C. III***, 2 A.3d 1201, 1211-12 (Pa. 2010) (internal citations omitted).

In their first claim, Individual Trustees aver that the orphans' court erred in failing to hold an evidentiary hearing before enforcing the Mediation Agreement, as the terms and existence of the Mediation Agreement were in dispute.  Individual Trustees' Brief at 21.  They claim that they preserved their

---

[3] On July 29, 2019, PNC filed a "Motion to Dismiss Certain Appellate Issues for Failure to Preserve."  This Court entered a *per curiam* order on August 1, 2019, denying PNC's motion without prejudice to its right to renew its motion on appeal after the assignment of this matter to a merits panel.  PNC filed its renewed motion to dismiss on October 28, 2019, which was deferred by *per curiam* order of this Court to the time of disposition.  Order, 11/7/19.

argument in their February 2, 2018 Motion to Abrogate, and in their answer and new matter to PNC's petition to enforce the Mediation Agreement. *Id.* at 22. The record clearly belies their claim.

In their motion, Individual Trustees expressly stated:

[T]his Petition seeks to abrogate, amend, or, *in the alternative*, suspend the implementation of [the] Mediation [Agreement] established during mediation between the parties pertaining to the procedure for making future donations and reimbursement of legal fees for the Trustees from the Trust. That [agreement] is now moot and, as further explained herein, implementation of the Mediation [Agreement] would be contrary to the [*Jackson*] Opinion—and, therefore, illegal—because, among other reasons, the Mediation [Agreement] does not allow for consideration of the factors the Superior Court has held are necessary for ascertaining and effectuating Grantor[s'] intent, including historical deference to the Jackson family regarding donation decisions. At minimum, however, implementation of the Mediation [Agreement] now, *before the proceedings ordered by the Superior Court*, would be premature and contrary to the directives of the Superior Court. Thus, in the alternative, the [M]ediation [Agreement] should be suspended pending the discovery and evidentiary hearings ordered by the Superior Court.

Motion to Abrogate at 3 (emphasis in original). Not only does it *not* dispute the existence of the Mediation Agreement, Individual Trustees' argument presumes that a settlement agreement was, in fact, reached. The premise of their motion is that the Mediation Agreement is contrary to the *Jackson* Opinion and, thus, cannot be implemented as a matter of law. *Id.* at 3, 11-17. Moreover, counsel for Individual Trustees acknowledged the existence of the Mediation Agreement at the February 12, 2018 hearing on the motion. *See* N.T. Hearing, 2/12/18, at 52-53 ("I am not up here saying we didn't reach [an] agreement. I am saying the agreement that was reached was wrong, it

- 10 -

was based upon a misunderstanding of the law….").  Likewise, Individual Trustees continued to aver in their answer and new matter that the Mediation Agreement cannot be enforced because it is in "material violation of" the **Jackson** Opinion.  **See** Answer and New Matter, 7/9/18.  Thus, we deem this issue waived.[4]

In issues III and IV, Individual Trustees assert that the Mediation Agreement is an unenforceable "agreement to agree," that it fails for lack of consideration, and that the agreement has terminated due to an indefinite duration.  They have failed to demonstrate, however, that these claims were properly raised before the orphans' court.  Prior to the filing of their appellate brief, the crux of their argument had been that the Mediation Agreement was inconsistent with the **Jackson** Opinion.  Whether the parties had reached a settlement agreement had not been a question.  After careful review of the

---

[4] Even if we determined that Individual Trustees had properly preserved this issue, we would deem their claim that the orphans' court erred in not holding an evidentiary hearing to be meritless.  While it is true that an evidentiary hearing must be held where a trial court is placed on notice of a dispute regarding whether a settlement agreement exists, no such dispute existed here.  Thus, Individual Trustees' reliance on **Viola v. Krouse**, 2013 WL 11276788, at *2 (Pa. Super. Feb. 21, 2013) (remanding for a hearing to determine if the parties reached a settlement where the Violas strongly contested the terms of the agreement as described in the motion to enforce) and **Brannam v. Reedy**, 906 A.2d 635, 641-42 (Pa. Cmwlth. 2006) (finding that the trial court erred in ruling on the appellants' motion to strike a settlement agreement without holding an evidentiary hearing where the appellants' counsel notified the court that the appellants had rejected the settlement), is misplaced.  Moreover, we note that Individual Trustee's citation to **Viola**, an unpublished Superior Court memorandum, violates Superior Court Internal Operating Procedure 65.37, which prohibits citation to unpublished memorandum decisions filed prior to May 1, 2019.

record, we agree with PNC that Individual Trustees have also failed to preserve issues III, and IV. Accordingly, we grant PNC's motion to dismiss issues I, III, and IV. **See** Pa.R.A.P.302(a) (stating "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

Before addressing the merits of Individual Trustees' remaining claim (Issue II), we set forth our scope and standard of review:

> The enforceability of settlement agreements is determined according to principles of contract law. Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision.
>
> **Ragnar Benson, Inc. v. Hempfield Township Mun. Auth.**, 916 A.2d 1183, 1188 (Pa. Super. 2007) (citations and quotation marks omitted). With respect to factual conclusions, we may reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record. **Skurnowicz v. Lucci**, 798 A.2d 788, 793 (Pa. Super. 2002) (citation omitted).

**Mastroni-Mucker v. Allstate Ins. Co.**, 976 A.2d 510, 517-18 (Pa. Super. 2009).

It has been well-established that:

> Where a settlement agreement contains all of the requisites for a valid contract, a court must enforce the terms of the agreement. **McDonnell v. Ford Motor Co.**, … 643 A.2d 1102, 1105 ([Pa. Super.] 1994)…. This is true even if the terms of the agreement are not yet formalized in writing. **Mazzella v. Koken**, … 739 A.2d 531, 536 ([Pa.] 1999); **see Commerce Bank/Pennsylvania v. First Union Nat. Bank**, 911 A.2d 133, 147 (Pa. Super. 2006) (stating "an agreement is binding if the parties come to a meeting of the minds on all essential terms,

even if they expect the agreement to be reduced to writing but that formality does not take place"). Pursuant to well-settled Pennsylvania law, oral agreements to settle are enforceable without a writing. **Pulcinello** [**v. Consolidated Rail Corp.**, 784 A.2d 122, 124 (Pa. Super. 2001)] (citing **Kazanjian v. New England Petroleum Corp.**, … 480 A.2d 1153, 1157 ([Pa. Super.] 1984)).

**Id.** at 518. **See also Step Plans Services, Inc. v. Koresko**, 12 A.3d 401, 409 (Pa. Super. 2010).

The law of this Commonwealth establishes that an agreement to settle legal disputes between parties is favored. There is a strong judicial policy in favor of voluntarily settling lawsuits because it reduces the burden on the court and expedites the transfer of money into the hands of a complainant. If courts were called on to reevaluate settlement agreements, the judicial policies favoring settlements would be deemed useless.

**Step Plans Services, Inc.**, 12 A.3d at 408-09.

Here, the record supports the orphans' court's finding that an agreement was reached at the October 11, 2017 mediation pertaining to the five-year period of 2017-2021 and thereafter, and that the terms of the Mediation Agreement are binding. **See** Order, 12/11/18; OCO II at 3 ("Given the immense detail in the mediation settlement as set forth by retired Judge … Lucchino, it is obvious that an agreement for 2017 moving forward had been effectuated."). All parties and their counsel expressly agreed to the Mediation Agreement on the record. **See** N.T. Mediation at 20-21, 32.

Having determined that the Mediation Agreement is a valid, binding agreement between the parties, we address Individual Trustees' claim that the Mediation Agreement is "materially inconsistent" with the subsequently

issued *Jackson* Opinion and the purpose of the Trust and, thus, it cannot be enforced. Individual Trustees' Brief at 27. First, we note that, in support of their argument, Individual Trustees falsely claim that the Mediation Agreement imposes "hard upper limits on annual donations in perpetuity[.]" *Id.* at 27-28. Pursuant to the terms of the Mediation Agreement, distributions for the five-year time period of 2017-2021 are limited to 6.5% of the market value of the Trust. Thereafter, *if no agreement can be reached*, 6% will be the *floor*. No ceiling has been set for distributions for 2022 and going forward. *See* OCO II at 1; N.T. Mediation at 9-10.

Individual Trustees further purport that the Mediation Agreement violates the *Jackson* Opinion and the terms of the Trust, because it does not require the trustees to act jointly. Individual Trustees' Brief at 29. As we previously established, Paragraph 6 of the Trust "requires the trustees to exercise their discretion in selecting gift recipients anew each year, and does not bind the trustees to contribute to the same organizations year after year." *Jackson*, 174 A.3d at 36-37. Additionally, we stated that "[the] selection of gift recipients must be done jointly by the Trust's three trustees in a good faith exercise of their discretion under the Trust[,]" and we emphasized that "the Trust … requires the Trust's three trustees to work together to perform that task." *Id.* at 37.

Contrary to Individual Trustees' position, we deem the Mediation Agreement to represent a "good faith exercise" of the parties' discretion under the Trust and to be consistent with this Court's directive that the trustees work

- 14 -

together. The Mediation Agreement represents an agreed upon compromise of the trustees on how to make annual distributions and to honor the Grantors' intent. Moreover, it allows for renewed discretion each year as to the charities selected to receive the Trust's distributions. Accordingly, we deem this argument meritless.

We reject the Individual Trustees' claim that the Mediation Agreement was nullified by the subsequent issuance of the ***Jackson*** Opinion. Based on our careful review, we discern no conflict in the terms of the Mediation Agreement and the determinations set forth in the ***Jackson*** Opinion. It is clear that the issues before this Court on appeal at 61 WDA 2017 concerned the amount and recipients of charitable distributions for *2016 only*,[5] whereas the Mediation Agreement clearly applies to 2017 and thereafter. Nothing in the ***Jackson*** Opinion conflicts with the terms of the Mediation Agreement or prevents its terms from being carried out. [6]

_____

[5] In its Rule 1925(a) opinion, the orphans' court explained its December 7, 2016 order, in which it selected PNC's proposed list of charities for distributions *in 2016* and limited the donations to 5% of the Trust's assets, as well as its denial of Individual Trustees' motion for reconsideration. It expressly stated that "nothing in the court's determinations for this calendar year[] should be interpreted or extrapolated to any future years." OCO I at 2.

[6] PNC's renewed motion to strike Individual Trustees' Appendix, filed on October 28, 2019, and deferred to the time of disposition by *per curiam* order of this Court dated November 7, 2019, is granted, without prejudice to Individual Trustees' right to present its petition to remove PNC as the corporate co-trustee before the orphans' court. ***See*** Renewed Motion to Strike, 10/28/19.

Accordingly, we affirm the orphans' court's December 11, 2018 order approving the Mediation Agreement.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/17/2020