134 Pa. Commonwealth Ct. 368 (1990)
579 A.2d 989
PENNSYLVANIA OSTEOPATHIC MEDICAL ASSOCIATION, Petitioner,
v.
Constance B. FOSTER, Insurance Commissioner of the Commonwealth of Pennsylvania and the Pennsylvania Insurance Guaranty Association; and Joseph Pulcini, Jr., Director, Medical Professional Liability Catastrophe Loss Fund, Respondents.
Commonwealth Court of Pennsylvania.
Argued June 12, 1990.
Decided August 9, 1990.
Reargument and Clarification Denied September 7, 1990.
*370 Sherry E. Baskin, with her, G. David Rosenblum, Astor, Weiss & Newman, Philadelphia, for petitioner.
Joseph M. Hankins, Jenkintown, with him, James J. McCabe and Lise Luborsky, Duane, Morris & Heckscher, Philadelphia, for respondent, Pennsylvania Ins. Guar. Ass'n.
Peter J. Hoffman, with him, Marybeth S. Christiansen, McKissock & Hoffman, P.C., Philadelphia (Milan R. Mrkobrad, Chief Counsel, Medical Professional Liability Catastrophe Loss Fund, and Arthur Selikoff, Asst. Counsel, Ins. Dept., Harrisburg, of counsel), for respondents Foster and Pulcini.
Before DOYLE and COLINS, (P.), JJ., and BARRY, Senior Judge.
*371 DOYLE, Judge.
Before us for disposition in our original jurisdiction are cross applications for summary relief. The instant case began when the Pennsylvania Osteopathic Medical Association (POMA) filed a petition for review in the nature of a complaint for a declaratory judgment. POMA has alleged that it is a non-profit corporation and an association representing approximately three thousand Pennsylvania osteopathic physicians. Named as respondents are the Pennsylvania Insurance Guaranty Association (PIGA), Constance B. Foster, Insurance Commissioner (Commissioner) and Joseph Pulcini, Jr., Director of the Medical Professional Liability Catastrophe Loss Fund (Director).
PIGA is an association established pursuant to The Pennsylvania Insurance Guaranty Association Act, Act of November 25, 1970, P.L. 716, as amended, 40 P.S. §§ 1701.101-1701.605 (PIGA Act). Among PIGA's duties[1] is the obligation to pay "covered" insurance claims of insolvent insurance companies within certain time constraints set forth in the PIGA Act. Every insurer within the Commonwealth, as a condition to writing property and casualty insurance in the state, must be a member of PIGA. Section 201(a) of the PIGA Act, 40 P.S. § 1701.201(a). The Commissioner is responsible for, inter alia, administering and enforcing the PIGA Act.
The Director is responsible for administering the Medical Professional Liability Catastrophe Loss Fund (CAT Fund). The CAT Fund is a contingency fund established under Section 701(d) of the Health Care Services Malpractice Act, Act of October 15, 1975, P.L. 390, as amended, 40 P.S. § 1301.701(d) (Health Care Act). The CAT Fund's principal *372 function is to pay awards, settlements and judgments for professional liability claims against health care providers entitled to participate in the fund where the provider's liability exceeds his/her/its basic insurance coverage in effect at the time of the occurrence giving rise to the claim. The CAT Fund also acts as primary coverage for professional liability claims that are filed more than four years after the tort occurred if filed within the applicable statute of limitations. Funds for the CAT Fund are obtained by levying an annual surcharge on all health care providers entitled to participate in the Fund.
In its petition POMA alleges that more than 500 of its members purchased medical malpractice liability insurance from the Professional Mutual Insurance Company (PMIC), a Missouri corporation, in order to satisfy the requirements of Section 701(a) of the Health Care Act, 40 P.S. § 1301.701(a). The osteopathic physicians, like all health care providers in Pennsylvania covered by the Act, except hospitals which carry higher limits, must maintain basic insurance coverage of $200,000 per occurrence and $600,000 aggregate coverage. Section 701(a)(1)(i-ii) of the Health Care Act, 40 P.S. § 1301.701(a)(1)(i-ii). Under Section 701(f) of the Health Care Act, 40 P.S. § 1301.701(f), the failure to comply with the insurance requirement in Section 701(a) results in the provider's license being suspended or revoked by the appropriate licensing board. POMA members also paid the annual CAT Fund surcharge.
The policies purchased from PMIC were written on an "occurrence" basis, meaning that they protected the insured from liability for any act done while the policy was in effect, that is, for any alleged tort which occurred while the policy was in effect and the company was not insolvent. Ohio Casualty Group of Insurance Companies v. Argonaut Insurance Co., 92 Pa. Commonwealth Ct. 560, 564 n. 7, 500 A.2d 191, 193 n. 7 (1985) (citing Appleman, Insurance Law and Practice (Berdal ed.) § 4503 (1979), citing St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 2926 n. 3, 57 L.Ed.2d 932 (1978)). Thus, *373 an occurrence policy would cover a claim where the alleged malpractice occurred during the term of the policy even if the claim is not made or the malpractice not discovered until after the policy has lapsed or been terminated by insolvency.
At the time POMA members took out the PMIC policies, PMIC was licensed to transact insurance business in Pennsylvania. However, on October 9, 1987, the Circuit Court of Jackson County, Missouri declared PMIC to be insolvent. Subsequently, the members of POMA purchased new policies with insurance companies licensed or approved in the Commonwealth to cover alleged acts of medical malpractice which would have occurred after the date of PMIC's insolvency. The Missouri court also established October 9, 1988, a full year after insolvency, as the final date for filing claims (claims bar date) against the PMIC liquidator.
The Commissioner and Director thereafter, in certain written memoranda, including a bulletin,[2] took the position that as of the claims bar date the POMA members would suffer a loss of the basic coverage mandated under the Health Care Act. As previously explained, the failure to acquire or maintain basic coverage is grounds for license suspension or revocation. The Commissioner, accordingly, advised the POMA members to purchase additional insurance to fill the "gap in coverage" between the claims bar date and the date on which the CAT Fund would become the insurer for PMIC.[3] The POMA members, fearful of losing *374 their licenses to practice medicine, were obliged to procure this substitute coverage.[4]
POMA then commenced the instant litigation seeking a declaration that its members should not have been required to purchase the substitute coverage because no gap in coverage ever existed because PIGA and/or the CAT Fund were obligated to provide insurance coverage. The Commissioner, the Director and PIGA filed answers and new matter to the petition raising various defenses to Petitioner's claim to which POMA then filed replies. The case is now before us on cross applications for summary relief pursuant to Pa.R.A.P. 1532(b) which permits us to enter judgment "if the right of the applicant thereto is clear."
POMA maintains that PIGA was obligated to assume responsibility for claims made under the PMIC occurrence policies and that its obligation did not end with the passage of the claims bar date, but rather continued with respect to the claims brought after the claims bar date provided the claims were based upon occurrences arising during the terms of the PMIC policies, that is, alleged acts of medical malpractice which occurred prior to October 9, 1987. It relies upon Section 201(b)(1) of the PIGA Act, 40 P.S. § 1701.201(b)(1), as authority for its argument that PIGA was obligated to provide coverage and hence no gap ever existed. Section 201(b)(1) states:
(b) Powers and Duties:
(1) The association shall:
(i) Be obligated to make payment to the extent of the covered claims of an insolvent insurer existing prior to the determination of said insurer's insolvency, and covered claims arising within thirty days after the determination of insolvency. . . .
(ii) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all *375 rights, duties, and obligations of the insolvent insurer as if that insurer had not become insolvent.
(iii) Assess member insurers in accordance with the provisions of Article III of this act the amounts necessary to pay the obligations of the association under subclause (i) of this clause the expenses of handling covered claims, the cost of examinations under section 203 and clause (3) of subsection (a) of section 401 of this act, and other expenses authorized by this act. (Emphasis added.)
Additionally, POMA contends that the CAT Fund was obligated to provide coverage during the relevant time period, that is, for alleged acts of medical malpractice which occurred prior to October 9, 1987, by providing either the excess coverage under Section 701(d) of the Health Care Act, 40 P.S. § 1301.701(d), for the first four years or by providing the basic coverage for the period beyond the four-year period after the alleged tort occurred, under the provisions of Section 605 of that Act, 40 P.S. § 1301.605. Section 701(d) of the Health Care Act states:
There is hereby created a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider entitled to participate in the fund as a consequence of any claim for professional liability brought against such health care provider as a defendant or an additional defendant to the extent such health care provider's share exceeds his basic coverage insurance in effect at the time of occurrence as provided in subsection (a)(1). Such fund shall be known as the `Medical Professional Liability Catastrophe Loss Fund'. . . .
And, Section 605 of the Act provides in pertinent part:
All claims for recovery pursuant to this act must be commenced within the existing applicable statutes of limitation. In the event that any claim is made against a health care provider subject to the provisions of Article VII more than four years after the breach of contract or tort occurred which is filed within the statute of limitations, such claim shall be defended and paid by the *376 Medical Professional Liability Catastrophe Loss Fund established pursuant to section 701.
POMA therefore contends that once PMIC was declared insolvent PIGA was responsible for the "basic coverage" as that term is used in Section 701(d) and the CAT Fund was obligated to continue to provide excess coverage; thus, there was never a "gap" in coverage. Further, it contends that any alleged tort which occurred prior to PMIC's insolvency but was presented more than four years later, was completely covered by the CAT Fund under Section 605 of the Health Care Act.
PIGA contends to the contrary that it is not obligated to provide coverage for claims filed with the liquidator after the claims bar date. It relies upon Section 559 of The Insurance Department Act of one thousand nine hundred and twenty-one, Act of May 17, 1921, P.L. 789, as amended, 40 P.S. § 221.59 (1921 Act).[5] That Section states in pertinent part:
(a) In a liquidation proceeding in a reciprocal state against an insurer domiciled in that state, claimants against the insurer who reside within this Commonwealth may file claims either with the ancillary receiver, if any, in this Commonwealth, or with the domiciliary liquidator. Claims must be filed on or before the last dates fixed for the filing of claims in the domiciliary liquidation proceeding.
Further, it contends that if it cannot use the claims bar date as the cut off date for its obligations its right to subrogation as provided in Section 502 of the PIGA Act, 40 P.S. § 1701.502, would be meaningless. It asserts also that the PIGA Act is not a substitute for all insurance the members would have had if PMIC had not become insolvent, as Section 201(b)(1)(i) of the PIGA Act, 40 P.S. § 1701.201(b)(1)(i), imposes a $300,000 limit per covered claim and ends PIGA coverage with claims arising thirty days after the determination of insolvency. Finally, PIGA *377 maintains that this Court lacks subject matter jurisdiction in this case because not all individuals who would be affected by the declaratory judgment have been joined as parties,[6] PIGA lacks standing to bring this suit, and laches, waiver and estoppel should bar relief.
The Commissioner and Director, in support of their cross applications, maintain that the Commissioner is not obligated nor empowered to provide substitute coverage to POMA members and that the fund is not obligated to provide coverage under the present circumstances because there has been no maintenance of basic coverage as that term is used in Section 701(d) of the Health Care Act. The Commissioner and Director further raise all of the defenses raised by PIGA, as well as the additional defenses of sovereign immunity and the absence of an actual controversy as to them. And, they also demur to the petition.
In order to determine whether POMA's application should be granted, we must first consider the various affirmative defenses raised by the three respondents.
With respect to the question of indispensable parties, the respondents contend that neither all claimants against PMIC-insured osteopaths nor all of the osteopathic physicians themselves are parties. We are of the opinion however that claimants and potential claimants have a distinct and separate interest, apart from POMA's interest, and are unnecessary to this litigation. Moreover, because the members of POMA purchased substitute insurance coverage, and hence any claims made will be paid either way, regardless of our decision, the claimants are palpably unnecessary parties here. As to the osteopaths, their interests are adequately represented by POMA with respect to this litigation because all that is sought is a declaration of rights. An association may represent the interest of its members in a declaratory judgment action. Paratransit Association of *378 Delaware Valley, Inc. v. Yerusalim, 114 Pa. Commonwealth Ct. 279, 538 A.2d 651 (1988). There is absolutely no request for damages in the petition and such a request cannot be reasonably inferred.[7] And, it is precisely because there have been no claims filed for damages that all the remaining affirmative defenses must fail. They are simply inapplicable where all that is sought is a declaration of what the law requires.[8]
We turn now to the question of whether a cause of action has been stated against the Commissioner and the Director. The Commissioner asserts that she has no authority to provide insurance to POMA's members. We agree; but that fact is of no consequence. As a careful reading of the petition for review discloses, the Commissioner is not asked to provide insurance. She is named here solely because it was her pronouncement, along with that of the Director, that POMA members had to purchase substitute insurance coverage. That pronouncement is the issue. Further, because her interpretation of the law is the issue and has resulted in a financial cost and economic loss to POMA members, there is also an actual controversy as to her. As to the question of whether POMA has stated a cause of action against the Director, the Commonwealth contends that the CAT Fund is not obligated to provide gap coverage. We believe, however, that that question goes to the merits of the instant lawsuit to which we now turn.
Under Section 201(b)(1)(i) of the PIGA Act, PIGA is obligated to "make payment to the extent of the covered claims of an insolvent insurer existing prior to the determination of said insurer's insolvency, and covered claims arising within thirty days after the determination of insolvency." The key term here is "covered claim" which is defined in Section 103(5) of the PIGA Act, 40 P.S. § 1701.103(5), as:

*379 (a) [A]n unpaid claim, including a claim for unearned premiums, which arises under a property and casualty insurance policy of an insolvent insurer and is:
(i) The claim of a person who at the time of the insured event resulting in loss or liability was a resident of this Commonwealth, or
(ii) A claim arising from an insured event resulting in loss or liability to property which was permanently situated in this Commonwealth.
(b) A covered claim shall not include any amount due any insurer, reinsurer, insurance pool, or underwriting association, as a subrogation recovery or otherwise.
(c) A covered claim shall not include any amount in excess of the applicable limits of the policy under which it arises.
The question we must thus decide is whether claims based upon occurrences which happened during the life of the policy, but were not made until subsequent to the claims bar date, arose under the PMIC policies. We hold that they did because the policies here were for occurrence coverage. Thus, as long as the occurrences were within the policy's term, the tortious act was "covered" under the PMIC policies and, accordingly, PIGA was statutorily required to assume responsibility for the claims irrespective of the claims bar date.
To repeat; Section 201(b)(1)(i) of the PIGA Act explicitly states:
(1) The association shall:
(i) Be obligated to make payment to the extent of the covered claims of an insolvent insurer existing prior to the determination of said insurer's insolvency, and covered claims arising within thirty days after the determination of insolvency . . . or before the insured replaces the policy . . . if he does so within thirty days of such determination.. . .
At the heart of the controversy is PIGA's argument that there is other limiting language imposed by the Missouri *380 Court order, that language being "presented within one year of the insolvency of the Missouri corporation." We refuse to accept that argument. The language of the Pennsylvania statute is clear and whatever the Missouri Court feels constrained to order insofar as its domestic insurance companies are concerned, it cannot affect the mandate of the Pennsylvania legislature encompassed within Section 201(b)(1)(i) of the PIGA Act. We do note, however, that alleged acts of medical malpractice which occurred after November 9, 1987 (i.e., 30 days after the date of insolvency) are not in issue. Those would be covered under the new policies purchased by the 500 POMA members.
We are referred by POMA to the NAIC[9] State Post-Assessment Insurance Guaranty Association Model Bill. This bill was originally adopted by NAIC in 1969. At that time it had no provisions dealing with the specific problem encountered here. We are advised by PIGA that Pennsylvania based its PIGA Act on this original Model Bill. Subsequently, in 1978, the Model Bill was amended to include a statement that "a covered claim shall not include any claim filed with the guaranty fund after the final date set by the court for the filing of claims against the liquidator or receiver of an insolvent matter." POMA argues that Pennsylvania "rejected" this amendatory language. PIGA counters that the amendment did not even come into existence until after our PIGA Act was passed (in 1970). While it is certainly true that the legislature could not have, in 1970, rejected an amendment to the Model Bill, which amendment did not come into existence until 1978, we think that what is far more telling is that since the advent of the amendment the Pennsylvania legislature has not acted to add a corresponding provision to our PIGA Act. And, quite frankly, we decline to do so by judicial fiat.
We now move to the question of the CAT Fund's coverage. Because we construe Section 201(b)(1)(i) of the *381 PIGA Act so as to conclude that "basic coverage," as that term is used in Section 701(d) of the Health Care Act, remains in effect, the statutory obligations of the CAT Fund under that Section and Section 605 of the Health Care Act, pertaining to the payment of stale claims, are brought into play. Accordingly, there is both a cause of action and an actual controversy stated as to the Director.
In reaching our conclusion that there was no gap in coverage of POMA's members, and hence that substitute insurance was unnecessary, we do not ignore the respondents' citation to Section 559 of the 1921 Act, but we do find that provision inapplicable because it deals with claims made by a patient-victim against the insurer ("claimants" under the terms of the 1921 Act) and not claims made by the insured doctors against the insurer. Further, to the extent any inconsistency between Section 559 of the 1921 Act and Section 701 of the Health Care Act can be fathomed, and we can fathom none, Section 701 is a special provision (as opposed to a general one) and must, accordingly, prevail. Section 1933 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1933.
We forthrightly acknowledge that there are compelling public policy arguments for both the positions taken in this matter and they have been thoroughly briefed and argued by all the parties. Because we believe, however, that the statutory language is absolutely clear, we will not digress to a discussion of these matters.
Based upon the foregoing discussion, we grant POMA's application for summary relief and deny the Commissioner's and Director's and PIGA's cross applications for summary relief.

ORDER
NOW, August 9, 1990, it is hereby ordered that the application for summary relief of POMA is granted and the cross applications for summary relief filed by the Commissioner and Director and PIGA are denied. This Court *382 hereby declares that the POMA members satisfied the mandatory insurance requirement of the Health Care Act and were not required to purchase substitute coverage due to the insolvency of PMIC and that no gap in coverage ever existed because PIGA and/or the CAT Fund were obligated to provide insurance coverage for the POMA members.
NOTES
[1] Section 102 of the PIGA Act, 40 P.S. § 1701.102, provides:

The purposes of this act are:
(1) To provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims, and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer;
(2) To assist in the detection and prevention of insurer insolvencies.. . .
[2] Bulletin No. 46 issued by the CAT Fund on December 8, 1988 over the signature of the Director pertinently states:

Because of the insolvency, and a claims' cut-off date of October 9, 1988 imposed by the Missouri court, these physicians will be uninsured for basic coverage for any claim made after October 9, 1988, which claim arose during PMIC coverage, and until such time as the claim may be covered under Section 605 of the Health Care Services Malpractice Act ("Act") (40 P.S. § 1301.605) [essentially, four years after the tort occurred]. (Emphasis added.)
[3] See note 2 above and text infra. Section 605 of the Health Care Act, 40 P.S. § 1301.605, provides that the CAT Fund pay on stale claims, that is, claims presented "more than four years after the breach of contract or tort occurred."
[4] The Director did not impose an additional CAT Fund surcharge because the members had already paid a surcharge on their original PMIC policies.
[5] Section 559 was added by Section 2 of the Act of December 14, 1977, P.L. 280.
[6] We note that a claim of this nature seems to be inconsistent with PIGA's cross application for summary relief. If PIGA believes we lack subject matter jurisdiction, it should at least have stated its claim for summary relief in the alternative.
[7] The instant case is, thus, distinguishable from Borough of Jefferson v. Century III Associates, 60 Pa. Commonwealth Ct. 94, 430 A.2d 1040 (1981), vacated on other grounds, 498 Pa. 57, 444 A.2d 665 (1982), which the Commissioner and Director cite to us.
[8] We express no opinion as to the applicability of these defenses should suits for damages be filed at some later point.
[9] NAIC is an acronym for the National Association of Insurance Commissioners.