**Storms v. O'Malley**

C.P. of Dauphin County, no. 1121 S 1996.

*Pamela G. Shuman,* for plaintiff.
*Linda Porr Sweeney,* for PIGA.
*Teresa Ficken Sachs,* for CAT Fund.
*Kenneth J. Serafin,* for Harrisburg Hospital.

TURGEON, *J.,* November 20, 1998—Defendants Thomas O'Malley M.D. and Dorko, Adams & Janson Associates, along with the Pennsylvania Insurance Guaranty Association (PIGA) and the Medical Profes-

sional Liability Catastrophe Loss Fund (CAT Fund), have appealed from an August 31, 1998 order granting plaintiffs' motion to compel settlement in the amount of $806,358. This opinion is written in support of that order pursuant to Rule of Appellate Procedure 1925(a). Pa.R.A.P. 1925, 42 Pa.C.S.

## PROCEDURAL AND FACTUAL HISTORY

Plaintiffs Sean and Wendy Storms instituted this action in 1996, individually and on behalf of their minor daughter, Rachel Storms. They alleged Dr. Thomas O'Malley was negligent in delivering Rachel during her birth on July 13, 1994 at Harrisburg Hospital. As a result, Rachel incurred shoulder dystocia resulting in a palsied right arm. Dr. O'Malley and his medical group, Dorko, Adams & Janson Associates, had primary malpractice insurance coverage with Physicians Insurance Company (PIC). In October 1997, PIC tendered its $200,000 policy limits to plaintiffs. At that point, the CAT Fund assumed defense of the action because it was legally liable for any award above PIC's insurance policy coverage.

On January 21, 1998, PIC was declared insolvent. Following a three-month stay of all proceedings, the case proceeded and PIGA assumed Dr. O'Malley's defense. On May 15, 1998, PIGA's counsel sent a form letter to plaintiffs' counsel indicating PIGA would assert its statutory offset right from PIC's $200,000 tender, deducting any amounts plaintiffs recovered from any other insurance source (such as health insurance coverage of medical bills). Counsel stated PIGA would seek an offset from any recovery obtained by plaintiffs "whether it be by verdict or settlement." (Def. ex. 2.) Counsel further requested a list of all insurance claims made by the Storms for Rachel's injury and indicated

that if the information was not forthcoming, she would file interrogatories. In addition, she indicated PIGA would seek to amend its new matter to assert its offset right as an affirmative defense.

Plaintiffs' counsel promptly responded that the offset issue was irrelevant since plaintiffs had the right to PIC's $200,000 limits whether PIGA paid the whole amount or whether Dr. O'Malley paid for any gaps in coverage created by PIGA's offsets. She stated the plaintiffs objected to discovery of any collateral insurance sources and concluded her clients "are not willing to accept limitations in Dr. O'Malley's coverage . . . ." Plaintiffs' counsel believed the PIGA Act did not protect the insured from being liable for the full amount of any judgment or settlement. Further, they considered that Act possibly invalid since a PIGA attorney asserting PIGA's offset right had a conflict of interest with the insured. (N.T. 57-58, 89, 91, 102-103.)

On June 10, 1998, PIGA's attorney, on behalf of Dr. O'Malley and his medical group, filed an amended answer with new matter asserting PIGA's right to offset. On June 19, 1998, plaintiffs filed a motion to strike the proposed amendment for the reasons articulated above.[1] The case was set for trial the week of June 22, 1998. The Friday before, June 19, 1998, PIGA's attorney met with a CAT Fund attorney and the CAT Fund's structured settlement consultant in an attempt to formulate a settlement offer. During the meeting, they contacted plaintiffs' counsel to ascertain the total medical bills paid by other insurance. (N.T. 12, 15-16, 19, 125-26.) According to plaintiffs' counsel, they were not advised the inquiry was intended to be used to calculate PIGA's offset. Instead, they assumed PIGA

---

1. The motion was never ruled upon since a settlement was reached.

and the CAT Fund needed the medical bill summary to evaluate the case for settlement purposes. (N.T. 68, 122-23.)

On June 23, 1998, counsel for plaintiffs, PIGA and Harrisburg Hospital, met in my judicial chambers for a pretrial conference to discuss settlement. Prior to these discussions, the CAT Fund had delegated its authority to conduct settlement negotiations on its behalf to PIGA's attorney. (N.T. 6.) Thus, at the June 23, 1998 discussions, *PIGA's counsel represented not only PIGA on behalf of Dr. O'Malley and his group, but also the CAT Fund.* Extensive settlement negotiations occurred for several hours. The parties finally reached a settlement in the fixed amount of $806,358, with Dr. O'Malley and his group tendering $801,358 and Harrisburg Hospital $5,000. (N.T. 8-9, 25-26, 36, 47, 51, 94, 96, 98, 120-21, 123.) The basic settlement was structured for plaintiffs to receive a $413,731 lump sum payment and the balance of $392,697 to purchase a bonded annuity, with details of the annuity's payment terms to be worked out. (N.T. 26.) The settlement consultant faxed several structured settlement proposals to chambers and during numerous telephone conversations, the numbers were revised to adjust the terms of payments at different times and different amounts during Rachel Storms' adult life. No issue regarding an offset for paid medical bills was raised during any of these negotiations or the structure revisions. The settlement amount of approximately $806,000 was clear. The only issues to be resolved were terms of payment.[2]

---

2. Both plaintiffs' attorney and Harrisburg Hospital's attorney testified that PIGA's attorney never raised the offset issue during the June 23, 1998 settlement negotiations. (N.T. 34, 46, 51, 117.) Nor was this issue raised in my presence. In addition, the structured

The settlement consultant worked out the details of the structure the next day. The parties arrived at the following structure: Of Dr. O'Malley's $801,358, $200,000 cash was to be paid by PIGA and $601,358 by the CAT Fund. The CAT Fund's contribution toward settlement included $208,731 cash and $392,627 for the annuity purchase. The settlement consultant testified his figures assumed a $200,000 tender from PIGA with no offsets. He was never told by PIGA's attorney (acting on behalf of both PIGA and the CAT Fund) to deduct any amount from PIGA's maximum liability in formulating the structure. (N.T. 25-28.) He testified that in order to make the agreed lump sum payment of $413,731, it was understood that the settlement would cost $806,358. (N.T. 28.) On June 24, 1998, plaintiffs' counsel faxed a copy of these settlement terms to PIGA's counsel, also representing the CAT Fund. (Plt. ex. 5.)

On July 2, 1998, plaintiffs filed a petition seeking court approval of the minor's settlement, a copy of which was mailed to PIGA's counsel. (N.T. 129.) On July 15, 1998, I entered an order approving the settlement based upon the terms reached on or about June 23, 1998. Up to this point, there had been no objections to the settlement terms by any party or their insurers.

On July 31, 1998, PIGA's counsel sent a full and final release to plaintiffs, as well as a cover letter indicating PIGA's intent to pay only $175,835 "representing the policy limits [$200,000] minus the statutory offset." Additionally, the proposed release included language requiring plaintiffs to request a sealing of the settlement documents and to "take whatever steps are

---

settlement consultant testified he was never told to offset any amount from PIGA's maximum liability ($200,000) in finalizing the structure. (N.T. 25-28.)

necessary to assure that such document(s) are not accessible or disclosed to anyone." These release terms were not discussed during settlement negotiations nor were they part of the settlement terms relayed verbally to the court on June 23, 1998, the date settlement was reached, nor were they included in the settlement formally approved July 15, 1998.

On August 4, 1998, plaintiffs filed their motion to compel compliance with the court-approved settlement. On August 14, 1998, defendant O'Malley and his group filed a petition to seal the record and close the hearing on the motion to compel. Hearings were held on August 25, 27 and 28, 1998. On August 31, 1998, I issued an order denying the motion to seal the record and granting the motion to compel settlement. I ordered PIGA to pay $173,835 cash by September 1, 1998 which was the amount of its $200,000 maximum obligation minus the disputed $26,165 offset for Blue Cross/Blue Shield collateral insurance. The CAT Fund and/or PIGA were ordered to remit the balance, $234,896, by December 31, 1998. This figure represented the $208,731 the CAT Fund was to pay in cash under the structured settlement, plus the amount of the disputed offset figure, which one of the parties was responsible to pay and which would be the subject of future litigation. I denied PIGA's request to deduct the statutory offset since it was not part of the settlement agreement. In addition, the CAT Fund was directed to provide plaintiffs with a full and final release by August 31, 1998, excluding the confidentiality clause.

## LEGAL DISCUSSION

PIGA is a creation of the Pennsylvania Property and Casualty Insurance Guaranty Act which consists of an association of independent property and casualty in-

surers whose purpose is to provide payment of covered claims in the stead of an insolvent insurer. 40 P.S. §991.1801 et seq.[3] PIGA is obligated to pay covered claims existing prior to the insurer's insolvency. 40 P.S. §991.1803(b)(1)(i). "The only limitation placed upon an injured party is that [PIGA's] own limitations of liability apply rather than those of the insolvent insurer. Thus, by clear and unambiguous terms of the statute, PIGA is deemed to be an insurer and is placed in the stead of the insolvent insurer, with all of that insurer's rights, duties, and obligations." *Donegal Mutual Insurance Co. v. Long,* 528 Pa. 295, 300-301, 597 A.2d 1124, 1127 (1991) (footnotes omitted); see also, *Matusz v. Safeguard Mutual Insurance Co.,* 340 Pa. Super. 116, 119, 489 A.2d 868, 870 (1985) (PIGA "steps into the shoes of the insolvent insurer but only to the extent of their obligations on 'covered claims . . .' ").

The offset provision asserted by PIGA is as follows:

*"Non-duplication of recovery*

"(a) Any person having a claim under an insurance policy shall be required to exhaust his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield and all other coverages except for policies on an insolvent insurer. *Any amount payable on a covered claim under this Act shall be reduced*

---

3. Insurance Company Law of 1921, enacted by Act of December 12, 1994, P.L. 1005, no. 137, §1, as amended by Act of December 21, 1995, no. 79, §15, effective February 19, 1996, 40 P.S. §991.1801 et seq.

*by the amount of any recovery under other insurance."* 40 P.S. §991.1817. (emphasis added)

The CAT Fund, created by the Health Care Services Malpractice Act,[4] is a Commonwealth agency providing professional liability insurance coverage for health care providers beyond the provider's basic coverage limits. 40 P.S. §1301.701(d). The CAT Fund was created for the express purpose of paying awards, judgments and settlements for losses or damages, as a consequence of professional liability claims brought against participating health care providers. 40 P.S. §1301.701(d). Its obligation is limited to amounts that exceed the health care provider's basic coverage insurance, up to its maximum statutory limits.[5] 40 P.S. §1301.701(d).

The parties have raised numerous issues in their statements of matters on appeal, summarized as follows: (1) the court erred in finding a settlement agreement existed, which did not require that PIGA's statutory offset apply; (2) the court erred in implicitly holding that PIGA could waive its right to assert the mandatory offset provision; (3) the court erred in finding the matter settled without requiring a confidentiality agreement nor a sealing of the record; and (4) the CAT Fund did not have a meaningful opportunity to participate in the settlement and the court's approval thereof.

---

4. Act of October 15, 1975, P.L. 390, no. 111, §101, as amended by Act of November 26, 1996, P.L. 776, no. 135, §10, 40 P.S. §1301.101 et seq.

5. The CAT Fund's limit on liability was $1,000,000 per occurrence for calendar years 1996 and earlier, $900,000 per occurrence for calendar years 1997 through 1998, $800,000 per occurrence for calendar years 1999 through 2000 and $700,000 for the calendar year 2001 and thereafter.

## Settlement Terms—Enforceability Without the Statutory Offset

The parties argue the court erred in finding a settlement agreement existed, without the offset provision applying, since there was no meeting of the minds on this important point. PIGA and the CAT Fund alternatively argue that, if this was not error, the court should have enforced the settlement only if the $26,165 offset was deducted from PIGA's obligation and the release contained language subjecting plaintiffs' recovery to offset, as required by law. The CAT Fund also argues the settlement agreement cannot be enforced since it contains language indicating it may be liable to plaintiffs for the amount of PIGA's statutory offset. The CAT Fund argues this renders the settlement unenforceable since it cannot be liable for any "drop down" coverage.

There exists a strong judicial policy in favor of voluntary settlement of lawsuits, primarily to expedite transference of money into the complainant's hands and also, secondarily, to reduce the expense and burden of litigation on the courts. *Sociedad Commercializadora v. Quizada,* 434 Pa. Super. 48, 55-56, 641 A.2d 1193, 1197 (1993). The enforceability of settlement agreements is determined according to contract law principles. *Century Inn Inc. v. Century Inn Realty Inc.,* 358 Pa. Super. 53, 58, 516 A.2d 765, 767 (1986). A settlement will be enforced if all the material terms of the bargain are agreed upon. *McDonnell v. Ford Motor Company,* 434 Pa. Super. 439, 445, 643 A.2d 1102, 1105 (1994), *appeal denied,* 539 Pa. 679, 652 A.2d 1324 (1994).

Under Pennsylvania law, "if the parties orally agree to all the terms of a contract between them and mutually expect the imminent drafting of a written contract re-

flecting their previous understanding, the oral contract may be enforceable." *Kazanjian v. New England Petroleum Corporation,* 332 Pa. Super. 1, 7, 480 A.2d 1153, 1157 (1984). See also, *Compu Forms Control v. Altus Group,* 393 Pa. Super. 294, 301, 574 A.2d 618, 622 (1990) (quoting *Johnston v. Johnston,* 346 Pa. Super. 427, 431, 499 A.2d 1074, 1076-77 (1985) ("If parties agree upon essential terms and intend them to be binding, 'a contract is formed even though they intend to adopt a formal document with additional terms at a later date.' "). The parties' intent is a question of fact to be determined by the fact-finder. *Johnston supra.*

It is abundantly clear defendant O'Malley and his group, acting through counsel, agreed to pay plaintiffs, in final settlement of this matter, a sum certain of $801,358. Not only did plaintiffs' attorneys so testify, but so too did the CAT Fund's attorney examiner, its settlement consultant as well as defendant Harrisburg Hospital's attorney. (N.T. 8-9, 25-26, 36, 47, 51, 94, 96, 98, 120-21, 123.) (Plt. ex. 6.) This was also the court's understating at the June 23, 1998 pretrial settlement conference.

PIGA's attorney, on behalf of all interested parties (other than Harrisburg Hospital), including both PIGA and the CAT Fund, agreed to a settlement with a current cash value of $801,358. The fact counsel may have assumed, during the pleading stages and at the beginning of negotiations, that the statutory offset would be deducted from PIGA's obligation is now irrelevant since counsel subsequently obligated both PIGA and the CAT Fund to the settlement amount of $801,358. Thus, plaintiffs are entitled to that amount regardless of which

defendant entity ultimately pays (PIGA, the CAT Fund or the individual defendants). Simply stated, there were no discussions whatsoever during negotiations between the parties that PIGA intended to take an offset against the agreed upon settlement figures. The CAT Fund's own independent settlement consultant was never told to base his calculations on any other figure. The fact PIGA's counsel had raised the offset issue prior to settlement negotiations when she was solely representing PIGA (and defendants to the extent of PIGA's obligation), does not limit the current obligation of either or *both* PIGA and the CAT Fund, since she represented both during final settlement negotiations. Accordingly, a binding settlement agreement with a current cash value of $806,358 was reached.

Nevertheless, the defendants, PIGA and the CAT Fund argue such a settlement cannot be enforced because it violates the law. PIGA argues that its offset right is statutorily mandated, thus it can be liable at most for $173,835 ($200,000-$26,165). The CAT Fund argues it can be statutorily liable only for any settlement amount above $200,000 ($801,358-$200,000) and that it cannot, under the law, drop down and cover the gap caused by PIGA's offset. See *Pennsylvania Osteopathic Medical Association v. Foster,* 134 Pa. Commw. 368, 579 A.2d 989 (1990), *appeal denied,* 525 Pa. 500, 582 A.2d 319 (1990). See also, *Judge v. Allentown and Sacred Heart Hospital Center,* 78 Pa. Commw. 373, 467 A.2d 899 (1983), *rev'd on other grounds,* 506 Pa. 636, 487 A.2d 817 (1985) (as a Commonwealth agency, it must act within the limits of the statute which created it). Indeed, "an agreement which violates a statutory provision, 'or which cannot be effectively performed without violating [a] statute, is illegal, unenforceable and

void ab initio.' " *Watrel v. Commonwealth, Department of Education,* 88 Pa. Commw. 1, 5, 488 A.2d 378, 381 (1985), *aff'd,* 513 Pa. 61, 518 A.2d 1158 (1986) (quoting *Gramby v. Cobb,* 282 Pa. Super. 183, 188, 422 A.2d 889, 892 (1980)). Thus, if it is determined PIGA's offset must apply against any settlement, then enforcement of the parties' settlement requires adding the offset amount to the CAT Fund's liability. This would give effect to all the interested parties' intent, including PIGA's and the CAT Fund's, that plaintiffs receive settlement with a cash value of $806,358. Such a result would not require the CAT Fund to provide "drop down" coverage. Otherwise, PIGA remains liable for its full $200,000 settlement obligation.

### Waiver of Offset Provision

The parties argue the court erred in implicitly holding that PIGA could and did waive its right to assert the mandatory offset provision. As set forth above, if PIGA can legally waive its offset right, it remains liable for $200,000. If not, settlement must be enforced by charging the CAT Fund with any amount lost due to the offset.

### Release

Defendants allege the court erred in concluding a confidentiality provision in the releases and a sealing of the record were not part of the settlement. They argue the court should not have ordered the production of a release without terms concerning confidentiality or the requirement of sealing. As previously stated, the settlement reached June 23, 1998 and formally approved July 15, 1998, did not include confidentiality, nor was that a term ever discussed during settlement negotiations.

In *Kazanjian, supra,* the Superior Court held an oral agreement to settle was binding even though, among other items, releases had not been reduced to writing. In support, the court quoted the Third Circuit, as follows:

"The settlement agreement which was entered into by duly authorized counsel expressed the intention to settle the case for the agreed amount and was valid and binding despite the absence of any writing or formality. . . . *The tender of a release did not reopen the agreement or make its execution a condition to the settlement itself." Kazanjian,* 332 Pa. Super. at 9, 480 A.2d at 1157-58 (quoting *Good v. Pennsylvania Railroad Co.,* 384 F.2d 989, 990 (3d Cir. 1967)). (emphasis added) (citations omitted)

Furthermore, an agreement to seal the record could not have been an essential term of the settlement agreement because it involved a minor. All minors' settlements require court approval and, thus, they are all public records subject to the public's right to access under both the First Amendment and common law. *Hutchison v. Luddy,* 398 Pa. Super. 505, 514, 581 A.2d 578, 582 (1990), *rev'd on other grounds,* 527 Pa. 525, 594 A.2d 307 (1991). See Pa.R.C.P. 2039. Court approval is never pro forma but requires an analysis of factors under both the First Amendment and common-law tests.

In addition, it was not error for this court to have refused to seal the record under the facts presented. Under the First Amendment analysis, only if the party seeking to seal the record can meet a heavy burden of showing "good cause" may the record be ordered sealed. *Hutchison* at 514, 581 A.2d at 582 (quoting *Publicker Industries Inc. v. Cohen,* 733 F.2d 1059 (3d Cir. 1984)). "Good cause is established on a showing that disclosure will work a clearly defined and serious

injury *to the party seeking closure.* The injury must be shown with specificity." *Publicker* at 1071 (3d Cir. 1984). (emphasis added) "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning," do not support a good cause showing. *Cipollone v. Liggett Group Inc.,* 785 F.2d 1108, 1121 (3d Cir. 1986), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487 (1987). Defendants' allegations of harm fall far short of meeting their burden. In their petition to seal, defendants asserted that the nature and amount of settlement, if publicly known, could expose the minor to real or potential undue harm, danger and/or harassment. In addition, they stated there is a strong public and private interest in encouraging future amicable settlements. Neither basis for sealing defines how a serious injury will be incurred by the *defendants.* Instead, they broadly cite to possible injuries to the minor and to all potential settlements involving a minor. See *Streett Estate v. General Motors Corp.,* 17 D.&C.4th 37 (York C.P. 1992).

In order to overcome the presumption of public access under a common-law analysis, the party seeking record closure must prevail under the balancing test set forth in *Bank of America National and Savings Association v. Hotel Rittenhouse Associates,* 800 F.2d 339, 344 (3d Cir. 1986). *Hutchison* at 514, 581 A.2d at 582. Under this test, defendants have the burden to show that the "interest in secrecy outweighs the presumption" which is accomplished by weighing the factors in favor of access and those against it. *Id.* (quoting *Bank of America* at 344). The party seeking closure "bears the burden of establishing that closure is appropriate under the circumstances." *Hutchison* at 513, 581 A.2d at 582 (citing *Katz v. Katz,* 356 Pa. Super. 461, 466, 514 A.2d 1374, 1379 (1986)). Defendants argue it is in the interest

of the child and her development that the record be kept secret and that when weighed against the fact there is no compelling governmental interest to seal the record, secrecy must prevail. We disagree. Plaintiffs, while remaining neutral on the petition to seal, respond that whether or not settlement information comes to public light is of little concern to them since they no longer reside in the area. Accordingly, the alleged secrecy interest evaporates. Thus, defendants have fallen far short of their burden showing secrecy outweighs the public access presumption. See *Streett Estate, supra.*

Accordingly, there is never a presumption, let alone an assumption or guarantee that a settlement reached with a minor will be kept confidential and the records sealed. Because there was no guarantee of confidentiality and a sealed record, there can be no court error in refusing to require confidentiality and a sealed record as a condition of settlement in this case.

## CAT Fund's Participation

The CAT Fund argues its procedural due process rights, as well as civil procedural rules, were violated when the court failed to allow defendants or their counsel an opportunity to participate fully in settlement negotiations and also by approving the minor's compromise without giving defendants or defense counsel a meaningful opportunity to oppose the issue and be heard regarding the offset issue.

Clearly, the CAT Fund fully participated in settlement negotiations. According to the CAT Fund's attorney examiner, the CAT Fund delegated its authority to conduct settlement negotiations to PIGA's attorney. (N.T. 6.) PIGA's attorney, in turn, kept the CAT Fund's at-

torney examiner apprised of negotiations and ultimately informed her a settlement amount had been reached. (N.T. 6.) Furthermore, PIGA's counsel kept in contact with the CAT Fund's structured settlement consultant during settlement negotiations and thereafter.

In addition, although the CAT Fund did not respond to the plaintiffs' July 2, 1998 petition to approve the minor's settlement prior to my signing it on July 15, 1998, they have since raised all the issues they could have then raised in its opposition to plaintiffs' motion to compel compliance with the settlement agreement and hearings were held thereon. Thus, its arguments have been fully considered.

Accordingly, plaintiffs' motion to compel settlement, in the amount of $806,358, was granted by order of August 31, 1998.